IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A RED APPLE IPHONE, ASSIGNED TELEPHONE NUMBER (978) 305-2137 AND A SILVER LG PHONE, ASSIGNED TELEPHONE NUMBER (978) 876-2190, CURRENTLY LOCATED AT 324 SOUTH RIVER ROAD, BEDFORD NEW HAMPSHIRE | Case No. 21-mj- 89-01/02-AJ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Casey T. MacDonald, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—

electronic devices—which are currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.      I am an investigative or law enforcement officer within the meaning of Title 18,

United States Code, Section 2510(7), that is, an officer of the United States who is empowered by

law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United

States Code, Section 2516

3.      I am a Special Agent with the United States Drug Enforcement Administration

("DEA") and have been so employed since 2014. I graduated from the DEA Training Academy in

Quantico, Virginia, where I received training in drug investigations, narcotics identification, search

warrants, undercover techniques, surveillance, debriefing of informants, and other investigative

procedures. I am currently assigned to the DEA's Southern New Hampshire High Intensity Drug

Trafficking Area Task Force ("HIDTA"). Prior to joining the DEA, I served as an officer in the

Uniformed Division of the United States Secret Service for approximately four years.  In addition, I hold a master's degree in criminal justice from the University of Massachusetts.

4.     Based upon my training and experience, I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs and the collection of money that constitutes the proceeds of drug trafficking activities.[1] I have worked in an undercover capacity on drug investigations. In that capacity, I have purchased controlled drugs and have also personally observed the distribution, sale, and possession of various controlled substances. I am familiar with the types of packaging used to distribute controlled substances as well as equipment used such as scales, bags, pill presses and cutting agents. I am also familiar with drug-related paraphernalia and the equipment used to ingest controlled substances, such as syringes and smoking pipes.  I have talked to drug dealers and listened to their conversations, so I am familiar with the coded language often used in these conversations. Because of my training and experience, I am familiar with new trends of concealing illegal drug trafficking. I also stay current on the latest technology used to investigate drug crimes. In sum, through my training, education, and experience, I have become familiar generally with the manner in which drug traffickers conduct their illegal activities, including purchasing, manufacturing, storing, and distributing drugs, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.

5.     I have participated in approximately seven Title III investigations in the Northeastern United States. I have been the affiant on Title III applications in two of those

---

[1] Observations made and conclusions drawn throughout this declaration that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

investigations.  I have also been involved in several state wiretap investigations in Massachusetts and New Hampshire.

6.      I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, and members of law enforcement.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is a red Apple iPhone, with telephone number (978) 305-2137, and a silver LG telephone with telephone number (978) 876-2190, hereinafter the "Devices."  The Devices are currently located at South River Road, Bedford, New Hampshire in the DEA non-drug evidence vault.

8.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.      Based upon information obtained from a variety of sources, including confidential sources, GPS tracking devices, cell phone location information, physical surveillance, intercepted communications, and controlled purchases of drugs, I believe that Manuel Emilio Delacruz-Diaz ("DELACRUZ-DIAZ"), Danaury Espinal-Lara ("ESPINAL-LARA"), Francisco Valdez-Aybar ("VALDEZ-AYBAR"), Santo Luis Araujo-Guerrero ("ARAUJO-GUERRERO"), Mikael Canario-Batista ("MIKEY"), Victor Tejada-Gonzalez, Edwin Flores ("PAPO"), Ramon Jacquez-Diaz ("MACHETE"), Carlos Patricio Ozuna Gonzalez, Ambiory Monegro-Reynoso ("AMBIORY"), Wandy Rosario ("ROSARIO"), Vivian LNU, Estiviz Estepan-Ortiz, Maribel Benjamin, and others

3

are actively involved in the distribution of substantial quantities of fentanyl in Massachusetts and New Hampshire. A law enforcement investigation that began in the summer of 2019 has led me to determine that these individuals are members of an organization that I have labeled the "DELACRUZ DTO." These individuals were indicted by federal grand jury on March 8, 2021, with one count of Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846, 841(a), and (b)(1)(A)(vi).

10.     On March 10, 2021, ARAUJO-GUERRRO was arrested on a warrant issued in relation to the March 8, 2021 Indictment.  Pursuant to a search incident to arrest, investigators seized two cellular phones from ARAUJO-GUERRERO.  The first cellular phone was a red Apple iPhone, with telephone number (978) 305-2137 ("TT-1"), and a silver LG telephone with telephone number (978) 876-2190 ("TT-2").  These phones are the Devices.

11.     Agents first identified TT-1 in May of 2019 from a confidential source (CS) who knew ARAUJO-GUERRERO as "CARLOS."  On May 16, 2019, the CS conducted a controlled purchase from ARAUJO-GUERRERO's organization by placing a phone call to TT-1 and ordering a "finger" of fentanyl. The CS completed the deal while under the supervision of law enforcement and purchased the fentanyl from one of ARAUJO-GUERRERO's runners. These drugs were confirmed by the DEA laboratory to be fentanyl.  Since May of 2019, agents continued to observe ARAUJO-GUERRERO utilize this telephone to conduct drug related operations. This telephone was discovered with ARAUJO-GUERRERO's during his arrest.

12.     On September 4, 2019, agents identified TT-2, which was being used by ARAUJO-GUERRERO to sell drugs. During a debrief of a confidential source of information, the CS provided TT-2 as a drug telephone for "Luis." I know that ARAUJO-GUERRERO's first name is "Luis," and that he was utilizing multiple phones for his operation. The CS indicated that

4

it would call this telephone and order drugs from ARAUJO-GUERRERO and would travel to

Knox Street, a location utilized by ARAUJO-GUERRERO to sell drugs and buy fentanyl in $20

bags. The CS identified a photo of ARAUJO-GUERRERO and confirmed that it was in fact the

same dealer it knew as "Luis." The following day, the CS conducted a controlled purchase of

fentanyl from Luis at the Knox Street residence. The CS placed a call to TT-2, met with Luis and

purchased 5 bags of fentanyl from him at the Knox Street location. These drugs were confirmed

by the DEA laboratory to be fentanyl.  Since this date, I believe that ARAUJO-GUERRERO has

continued to use TT-2 to conduct his day to day drug operation. This telephone was with

ARAUJO-GUERRERO at the time of his arrest.

     13.    During the course of this investigation, five Title III applications were made to

and granted by District Court Judge Paul J. Barbadoro in the District of New Hampshire, to

intercept electronic and wire communications over ten different cellular telephones. An order

dated March 13, 2020, authorized the interception of wire communications over TT-1 and TT-2,

phones both utilized by ARAUJO-GUERRERO.

     14.    On March 13, 2020, ARAUJO-GUERRERO placed a call on TT-1 to co-

defendant VALDEZ-AYBAR, a fentanyl trafficker in Lawrence, Massachusetts. During this call,

ARAUJO-GUERRERO asked if VALDEZ-AYBAR could "swing by here." Later in a

subsequent call, at approximately 3:35 p.m., over TT-1, VALDEZ-AYBAR asked ARAUJO-

GUERRERO, "Should I bring you one and a half or 100?" ARAUJO-GUERRERO responded

"no, one hundred" and VALDEZ-AYBAR affirmed. VALDEZ-AYBAR also told ARAUJO-

GUERRERO that he was waiting for his wife to come home and watch his children, before he

left.

15.     Later in the day, at approximately 5:33 p.m., agents observed VALDEZ-AYBAR exit his home on 7 William Street and enter a taxi cab. Agents followed this taxi toward Knox Street. During this ride, VALDEZ-AYBAR called TT-1 and told ARAUJO-GUERRERO "I'll be there in one minute." Within approximately two minutes, agents observed the taxi arrive at 86 Knox Street. VALDEZ-AYBAR exited the taxi, walk into the 86 Knox Street residence and then returned out approximately two minutes later. VALDEZ-AYBAR returned to the taxi and departed the area. Based on these exchanges and surveillance, I believe that ARAUJO-GUERRERO ordered approximately 100 grams of fentanyl from VALDEZ-AYBAR which he subsequently delivered directly to the 86 Knox Street residence. Through several controlled purchases in the past, I know that VALDEZ-AYBAR is a fentanyl trafficker and I also know that he frequently uses taxi cabs during the course of his operation. Based on this series of calls, I believe that VALDEZ-AYBAR has been contacted by ARAUJO-GUERRERO on TT-1 in the past for similar drug deals.

16.     On March 17, 2020, ARAUJO-GUERRERO was intercepted over TT-1 speaking with a known drug customer named Enrique Castillo. During this call, Castillo indicated that he was on his way to ARAUJO-GUERRERO's location. Castillo asked for "one and one, put it in a napkin please." At approximately the same time this call occurred, agents observed Castillo arrive in a silver minivan to 86 Knox Street, Lawrence, Massachusetts. This was the "trap house" which ARAUJO-GUERRERO operated his drug business from.at the time. Agents observed Castillo exit his car, walk to ARAUJO-GUERRERO's porch, then after approximately two minutes, returned to his car and departed.

17.     Later on the same day, at approximately 3:25 p.m., ARAUJO-GUERRERO received a call on TT-1 from an unknown Spanish speaking male. During this call the unknown

6

male asked for "40 or 50." ARAUJO-GUERRERO confirmed the order for "50" and then ended the call. Approximately ten minutes later, this same unknown male called and confirmed that he was on his way to "Knox Street" and also confirmed his order of "50." The unknown male told ARAUJO-GUERRERO that he was almost there. Approximately three minutes later, agents observed an unknown male arrive in a silver mini-van at 86 Knox Street. ARAUJO-GUERRERO exited 86 Knox Street, walked up to the van window and made an exchange through the passenger side window, to the driver. ARAUJO-GUERRERO then walked back in to 86 Knox Street and the van departed. Based on the timing and the aforementioned calls, I believe that the driver of the silver van was the unknown male who ordered "50." I believe that "50" was 50 grams of fentanyl. I believe this based on prior controlled purchases carried out with ARAUJO-GUERRERO and other intercepted calls where similar exchanges have occurred.

18.     Later in the week, on March 18, 2020, ARAUJO-GUERRERO received a call on TT-1 from Leslie RIVERA, known to investigators as his girlfriend. During this call she stated "there is no….there is only a little bit of cut left." ARAUJO-GUERRERO replied "Damn," and RIVERA stated, "I just wanted to let you know, that you have to go get it on your way back, because there is none. I was going to cook some but there is none there."   ARAUJO-GUERRERO affirmed and the call ended. Based on this call, I believe that RIVERA was calling ARAUJO-GUERRERO on TT-1 to tell him to purchase more cut for their drug operation. I believe RIVERA was in the process of cutting drugs, but had in fact run out of the diluent to add to the drugs.

19.     Later during the intercept period, on March 28, 2020, ARAUJO-GUERRERO placed a call on TT-2 to Hector CUEVAS, a cocaine supplier in the Lawrence area. During this call, ARAUJO-GUERRERO and CUEVAS had this exchange:

| | |
|---|---|
| **ARAUJO-GUERRERO**: | Are you grabbing? |
| **CUEVAS**: | No |
| **ARAUJO-GUERRERO**: | Big one |
| **CUEVAS**: | Huh? |
| **ARAUJO-GUERRERO**: | Big One! |
| **CUEVAS**: | Knox? |
| **ARAUJO-GUERRERO**: | Yes |
| **CUEVAS**: | Alright |

Based on this exchange, I believe that ARAUJO-GUERREO was ordering a drug "re-up" from CUEVAS. ARAUJO-GUERRERO has been intercepted in the past ordering a "big one" or "small one" from CUEVAS, however, investigators have not determined the amount each represents. I also know that CUEVAS has frequently been to 86 Knox Street in the past and I do not believe he is a drug customer.

20.     Approximately ten minutes after this previous call, agents observed CUEVAS exit his house on Canal Street in Lawrence and depart in his vehicle. A few minutes later, ARAUJO-GUERRERO called CEUVAS using TT-2 and asked him if he was on his way. CUEVAS responded "one second."  At approximately 2:07 p.m., I observed CUEVAS arrive at 86 Knox Street, where ARAUJO-GUERRERO was waiting in the driveway. CUEVAS and ARAUJO-GUERERO initially greeted each other but then turned back to back to each other. I observed ARUAJO-GUERRERO pass CUEVAS money, while standing with their backs to each other. CUEVAS then took an unknown item from his sweatshirt pocket and placed it into ARAUJO-GUERRERO's open hand. ARAUJO-GUERRERO quickly put the item in his own pocket and then re-entered 86 Knox Street. CUEVAS returned to his vehicle and departed the area. Based on my training and experience, I believe this was a hand to hand drug transaction between ARAUJO-GUERRERO and CUEVAS. I believe that they attempted to conceal their act by standing back to back, however I was still able to observe the exchange with a camera.

21.     On April 3, 2020 at approximately 10:23 a.m., ARAUJO-GUERRERO placed a call on TT-2 to CUEVAS. During this call, ARAUJO-GUERRERO asked CUEVAS to "come" to which CUEVAS replied "How?" ARAUJO-GUERRERO replied "small" and the call ended. A short time later, agents observed via a court ordered GPS device attached to CUEVAS' vehicle, that he began traveling toward 86 Knox Street. At approximately 10:38 a.m., agents observed CUEVAS arrive at 86 Knox Street and exit his vehicle. CUEVAS was holding a white object in the palm of his hand. CUEVAS went into 86 Knox Street for approximately two minutes, then exited empty handed and returned to his car, then departed. Based on this exchange, I believe that CUEVAS brought ARAUJO-GUERRERO an unknown amount of drugs which were referred to as a "small." In previous surveillance carried out on CUEVAS and ARAUJO-GUERRERO, they will do a hand to hand exchange where they palm the drugs in an attempt to be discreet.

22.     During the course of the investigation agents also received Title III authority to intercept wire an electronic communications over two different phones used by co-defendant VALDEZ-AYBAR.  During these interceptions, ARAUJO-GUERRERO was intercepted discussing drug trafficking.

23.     On September 2, 2020, at approximately 6:53 p.m., ARAUJO-GUERRERO called VALDEZ-AYBAR using TT-1 and the two had the following conversation:

| | |
|---|---|
| VALDEZ-AYBAR: | Talk to me. |
| ARAUJO-GUERRERO: | You always change things on me, you have to tell me when you change it. |
| VALDEZ-AYBAR: | What's up? |
| ARAUJO-GUERRERO: | It is not coming out good, I am doing it the same and they already gave me a complaint. And they don't complain about the other one. |
| VALDEZ-AYBAR: | It can't be buddy. |

9

| | |
|---|---|
| ARAUJO-GUERRERO: | Listen, I had a bit from the other one there and I said to myself, "No, let me try this before anything." And I changed it, I made the one that you brought me. And they already gave me complaints. |
| VALDEZ-AYBAR: | How much did you make? |
| ARAUJO-GUERRERO: | The same (amount) as I the other one. |
| VALDEZ-AYBAR: | That is the same one. Man, so and so called me for a little thing of that... your nephew. is the same. |
| ARAUJO-GUERRERO: | Who, Anselmo? |
| VALDEZ-AYBAR: | Yes. |
| LUIS ARAUJO: | Yes, because I didn't give him from the old one but from the one you brought me. |
| VALDEZ-AYBAR: | The first one is the one that you gave him? |
| ARAUJO-GUERRERO: | Of course, from the first one. The first one that you brought me, I only tried this one with my people. |
| VALDEZ-AYBAR: | Okay, I'll head over there now. |

24.     Based on this conversation, I believe that ARAUJO-GUERRERO was calling VALDEZ-AYBAR to complain about the quality of the drug that he had received from VALDEZ-AYBAR. ARAUJO-GUERRERO insisted that he was mixing his drugs as he usually does but that he had already been getting complaints from his customers. VALDEZ-AYBAR agreed to head over to ARAUJO-GUERRERO's in order to fix the issue with the poor-quality drugs.

25.     On November 6, 2020, at approximately 11:35 a.m., VALDEZ-AYBAR sent a series of text messages to ARAUJO-GUERRERO at TT-1.  He told ARAUJO-GUERRERO, "I have [o]f the first ones I gave you [i]n February."  ARAUJO-GUERRERO responded by text message on TT-1 and said, "Ok," "Let me finish these to take care of you," and "I owe you a little bit, but it's not lost."  The next day, November 7, 2020, VALDEZ-AYBAR again spoke with ARAUJO-GUERRERO on TT-1 and said, "Are you there?" to which ARAUJO-GUERRERO responded, "Yes."  VALDEZ-AYBAR told him, "Open up in a minute, to give you

10

something," and ARAUJO-GUERRERO responded, "Okay."  I believe based on this exchange, that VALDEZ-AYBAR was offering ARAUJO-GUERRERO fentanyl from the same source that he had previously sold to ARAUJO-GUERRERO the previous February.  I believe ARAUJO-GUERRERO was waiting to finish selling the supply he had in order to pay off his drug debt to VALDEZ-AYBAR.  I believe that the next day, VALDEZ-AYBAR went to ARAUJO-GUERRERO's in order to provide these drugs to him.

26.     Based upon my training and experience, I know that drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities.  Evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from many cell phones. In addition, members of this drug trafficking organization frequently discussed communicating with each other over social media platforms, including some that are encrypted and therefore difficult for law enforcement to intercept (e.g., WhatsApp). During intercepted calls, members of this DTO discussed communicating with each other over WhatsApp, and Facebook. I know, based on my training and experience, that drug traffickers may use these platforms to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection.

27.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular

numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case, such as this, where investigators have analyzed telephone toll records involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events. In addition, in a wiretap investigation such as this, possession of a telephone that has been intercepted discussing DTO business can be evidence of the involvement of the person who possesses it.

28.     Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that violation of 21 U.S.C. §§ 846 and 841 (conspiracy to distribute and possess with intent to distribute controlled substances) have been committed by ARAUJO-GUERERO, VALDEZ-AYBAR, and others known and unknown.  I submit that there is probable cause to believe, and I do believe, that the information described in Attachment B will constitute evidence of these criminal violations.

29.     The Devices are currently in the lawful possession of the DEA.  They came into the DEA's possession in the following way: The cellular phones were seized incident to arrest when the defendant was arrested on March 10, 2021, on a warrant issued after her indictment on one count of conspiracy to distribute and possess with intent to distribute a controlled substance, fentanyl.

30.     The Devices are currently in storage at 324 South River Road, Bedford, New Hampshire.  In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the DEA.

## **TECHNICAL TERMS**

31.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader.  Removable

storage media include various types of flash memory cards or miniature hard

drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its

current location.  It often contains records the locations where it has been.  Some

GPS navigation devices can give a user driving or walking directions to another

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

32.   Based on my training, experience, and research, and from consulting manufacturer advertisements and product technical specifications available online, I know that

the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable

media player, GPS navigation device, PDA, and to access the internet.  In my training and

experience, examining data stored on devices of this type can uncover, among other things,

evidence that reveals or suggests who possessed or used the device, evidence of communications

between the users and others, and location information, and other data that may be evidence of

conspiracy to distribute and possess with intent to distribute controlled substances.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

33.      Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensics tools.

34.      *Forensic evidence.*  As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when.  There is probable cause to

believe that this forensic electronic evidence might be on the Device because:

    a.   Data on the storage medium can provide evidence of a file that was once on the

        storage medium but has since been deleted or edited, or of a deleted portion of a

        file (such as a paragraph that has been deleted from a word processing file).

    b.   Forensic evidence on a device can also indicate who has used or controlled the

        device.  This "user attribution" evidence is analogous to the search for "indicia of

        occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

36. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the

Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

37.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Devices described in Attachment A to seek the items

described in Attachment B.

I declare that the foregoing I true and correct.


/s/ Casey T. MacDonald
_____
Casey T. MacDonald, Special Agent
United States Drug Enforcement Administration


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and
affirmed under oath the content of this affidavit and application.

_____
UNITED STATES MAGISTRATE JUDGE
 **Apr 1, 2021**

**ATTACHMENT A**

The property to be searched is a red Apple iPhone, with telephone number (978) 305-2137, and a silver LG telephone with telephone number (978) 876-2190, hereinafter the "Devices."  The Devices are currently located at South River Road, Bedford, New Hampshire in the DEA non-drug evidence vault.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of

**21 U.S.C. §§ 841 and 846,** and involve **Santo Luis Araujo-Guerrero** since **May 16, 2019,**

including:

      a.   Information associated with drug trafficking, including pay-owe sheets, buyer

           lists, telephone lists, address books, seller lists, ledgers, records of sales, records

           of expenditures made to purchase controlled substances, and records of

           expenditures to purchase products which are used in the distribution of controlled

           substances

      b.   lists of customers and related identifying information;

      c.   types, amounts, and prices of drugs trafficked as well as dates, places, and

           amounts of specific transactions;

      d.   any information related to sources of drugs (including names, addresses, phone

           numbers, or any other identifying information);

      e.   any information recording **Santo Luis Araujo-Guerrero's** schedule or travel

           from **May 16, 2019** to the present;

      f.   information reflecting contact or communication with coconspirators, the

           distribution of controlled substances to coconspirators, and the disposition of

           proceeds of controlled substances (including within messaging applications like

           WhatsApp, Snapchat, and Instagram stored on the phone);

      g.   all bank records, checks, credit card bills, account information, and other financial

           records.

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.